Filed 4/10/19

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>v.<br><br>ANTONIO EDWARDS,<br><br>　　　Defendant and Appellant. | A147103<br><br>(Alameda County<br>Super. Ct. No. 171347A) |
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>v.<br><br>EMMANUEL CHIOMA,<br><br>　　　Defendant and Appellant. | A147379<br><br>(Alameda County<br>Super. Ct. No. 171347B) |

　　　Appellants Emmanuel Chioma and Antonio Edwards were each convicted on multiple counts arising from their joint sexual assault and robbery of Jane Doe and robbery of her male friend. With "one-strike" and other allegations against them, Chioma was sentenced to 129 years to life, and Edwards was sentenced to 95 years to life. Appellants were both 19 years old when they committed these offenses.

　　　Appellants challenge their respective prison sentences as cruel and unusual punishment, and they challenge on equal protection grounds their exclusion from the

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of the Discussion, Section I.

1

provisions of Penal Code section 3051[1]—which mandates youthful-offender parole hearings for most who receive de facto life sentences for crimes they commit at or before age 25. In the published portion of our opinion, we reject appellants' cruel and unusual punishment challenge but accept their equal protection arguments. In the unpublished portion we reject two further challenges—Chioma's to the sufficiency of the evidence of his involvement in the crimes and Edwards's to the admission into evidence of photographs recovered from Chioma's phone. We therefore affirm the judgments, except to the extent we remand to allow appellants to develop the record with evidence of youth-related factors that will be relevant in a youthful-offender parole hearing.

## BACKGROUND

### I. Sexual Assault and Robberies

At 11:30 p.m. on December 8, 2012, Jane Doe and Rafael Reynolds stopped at Reynolds's Oakland home before driving to a fundraiser where Reynolds, a professional photographer, planned to take photographs. Inside, one of Reynolds's roommates told them someone had been robbed nearby by two men several hours earlier. When Doe and Reynolds prepared to leave for the fundraiser, they paused on their way out as they saw two men walk by. When the men were out of sight, Doe got into the passenger seat of her Mercedes, which Reynolds planned to drive to the fundraiser, and Reynolds went to his truck to retrieve some photography equipment. It was approximately 11:45 p.m.

Suddenly, a man opened the passenger door to the Mercedes, placed a gun to Doe's head and ordered her out of the car. The gunman, Chioma, demanded money from Doe and grabbed her bag. Another man, Edwards, put a gun to Reynolds's head and ordered him to the ground. One of the gunmen took Reynolds's keys, money clip, and phone. Edwards then switched positions with Chioma and placed his gun to Doe's chest. Edwards opened Doe's jacket and lifted up her shirt. Chioma returned and directed Doe to get on her knees in between the two vehicles. With a gun still to her head, Doe

---

[1] All statutory citations are to the California Penal Code, unless otherwise indicated.

complied. Chioma then took out his penis and forced Doe to orally copulate him, telling her "to act like you mean it" if she did not want "something to happen" to her.

Edwards then ordered Doe to stand up, pulled her pants down, and forced his penis into her vagina. For a time, Chioma compelled Doe to orally copulate him while Edwards was raping her. Then, as Edwards persisted in raping Doe, Chioma moved away and began searching through the Mercedes to see what "he could take." Edwards paused in raping Doe to pull her into the back seat of the Mercedes, but Chioma immediately told him to remove her. Edwards again raped Doe from behind, attempting to insert his penis into her anus before inserting it back into her vagina. Meanwhile, Chioma walked to where Reynolds lay on the ground and hit Reynolds in the back of the head with his gun; Doe recalled hearing a "crack" which she was "sure was the gun." Edwards eventually withdrew his penis and Doe saw him ejaculate onto the ground near where they were standing. Chioma and Edwards then left. In addition to the items already taken from Reynolds, the two men left with Doe's purse, including her wallet and phone.

Doe found Reynolds unconscious. She summoned one of Reynolds's roommates to call 911, and the Oakland police responded to investigate. Officers spoke with Doe and recovered the semen from the ground near her car. In a subsequent meeting with police, Doe identified a photograph of Chioma as the person who pulled her out of the car and forced her to orally copulate him. At trial, she identified Chioma with "a hundred percent certainty." Doe could not positively identify Edwards, however. Edwards was identified by DNA recovered from the semen. Police recovered a fingerprint matching Chioma's from the driver's-side door of Doe's car.

Police also obtained surveillance video from outside Reynolds's home, and the prosecution played it for the jury at trial. The video depicted most of the incident, including Doe and Reynolds parking her car and entering Reynolds's house, leaving Doe's Mercedes in the center of the image; Doe and Reynolds exiting Reynolds's house and returning to their vehicles; one assailant removing Doe from her Mercedes and another forcing Reynolds out of view; Doe being forced to her knees to orally copulate

3

someone; someone else having vaginal sex with her from behind; two men walking away; and Doe checking on Reynolds and then ringing the buzzer to his house. Doe acknowledged the video was not clear enough to show faces, but she was confident it clearly depicted the incident, including the respective actions of the two assailants.

Reynolds sustained a concussion that left him unable to walk for several days and unable to focus his eyes—particularly with a camera—for significant periods of time. He still suffered from abnormal eyesight, headaches, and an inability to concentrate at the time of trial in 2015.

## II.      Arrests in Possession of Firearms

Five days after the assault, at approximately 10:30 p.m., appellants were detained by private security officers after Chioma purchased drugs in Oakland. Chioma, Edwards, and a friend had driven to the purchase location and were stopped while still in their vehicle. Edwards was in the driver's seat, Chioma was in the front passenger's seat, and their friend was in the back seat. The security officers located a handgun in Chioma's waistband and another gun, with an extended magazine, on the floorboard beneath where Edwards was sitting. An Oakland police officer was dispatched to the scene and recovered the guns. The gun recovered from Chioma's waistband was a loaded .40-caliber Glock with a 30-round clip. The gun recovered from the driver's side floorboard was a loaded .45-caliber Colt with an extended magazine. Officers also seized four mobile phones during the incident and booked them into evidence. Chioma and Edwards were arrested.

Police subsequently examined the four mobile phones and their contents. From an HTC phone identified with Chioma, police recovered several photographs taken in the months leading up to these incidents. Several of the photographs depicted guns, including the two guns found in the car that night. The parties described one of the photographs as showing "Edwards allegedly or purportedly with a gun on his hip." The same phone received a call from a contact listed as "Bankhead" at approximately 11:45 p.m. on December 8, 2012. This was just as the assault of Doe and Reynolds began, and

4

the call lasted 13 minutes and 26 seconds. A phone associated with Edwards did not contain photographs of guns.

## III. Procedural Background

The operative consolidated information charged appellants with the following counts as to the December 8, 2012 incident: oral copulation by acting in concert with force and fear (§ 288a, subd. (d)(1) (count 1)) as to Chioma and Edwards; attempted sodomy by use of force (§ 286, subd. (c)(2)(A) (count 2)) as to Edwards only; forcible rape while acting in concert (§ 264.1, subd. (a) (counts 3 and 4)) as to Chioma and Edwards; assault with a firearm (§ 245, subd. (a)(2) (count 5)) as to Chioma only; and second degree robbery (§ 211 (counts 6 and 7)) as to Chioma and Edwards.

As to the December 13h, 2012 incident, the information charged appellants with: carrying a concealed firearm on the person (§ 25400, subd. (a)(2) (count 8)) as to Chioma only; carrying a loaded firearm on one's person in a city (§ 25850, subd. (a) (count 9)) as to Chioma only; carrying a concealed firearm within a vehicle (§ 25400, subd. (a)(1) (count 10)) as to Edwards only; carrying a loaded firearm on one's person in a vehicle in a city (§ 25850, subd. (a) (count 11)) as to Edwards only; and possession of a firearm by a felon with priors (§ 29800, subd. (a)(1) (count 12)) as to Edwards only.

The information also alleged numerous sentencing enhancements against appellants. Enhancement allegations arising from the sexual assault and robbery included those against Chioma for inflicting great bodily injury on Reynolds (§ 667.61, subd. (d)(6)), against Edwards for Chioma's infliction of great bodily injury on Reynolds in the course of Edwards's violation of section 288a, subdivision (d) (in-concert oral copulation with force and fear) (§ 667.61, subds. (e)(7) and (d)(6)), and against both Chioma and Edwards for personal use of a firearm (§§ 667.61, subd. (e)(3), 1203.06, subd. (a)(1), 12022.5, subd. (a), 12022.53, subd. (b), and 12022.53, subd. (g)). If found true by the jury, these enhancements would mandate that appellants each serve a sentence of at least 25 years to life on count 1 (forced oral copulation in concert), count 3 (forcible rape in concert), *and* count 4 (forcible rape in concert). (§ 667.61, subds. (c)(3) & (c)(7).)

5

On October 29, 2015, the jury found Edwards guilty as charged except as to count 2 (attempted sodomy by force), and found all related allegations true. The jury found Chioma guilty as charged and all related allegations true. On December 7, 2015, the court sentenced Chioma to a prison term of 129 years to life and Edwards to a prison term of 95 years to life. Appellants each filed a timely notice of appeal.

## DISCUSSION

### I. Appellants' Guilt-Phase Challenges Fail

#### A. *Substantial Evidence Proved Chioma's Participation*

Chioma challenges the sufficiency of the evidence that he participated in the December 8th sexual assault and robbery. He acknowledges there was substantial evidence of his participation in the form of Doe's identification of him, before and during trial, and the presence of his fingerprint on the exterior of Doe's car, and he concedes "[a]rguably, this would be sufficient in an ordinary case." He contends, though, that the cell phone call made from his friend Bankhead's phone to one of Chioma's phones, which according to the timestamp on the surveillance video was essentially contemporaneous with this attack, provided him with an alibi. Chioma's argument is unpersuasive.

When faced with a substantial evidence challenge, we "must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578; accord, *Jackson v. Virginia* (1979) 443 U.S. 307, 318–319.) "[T]he direct testimony of a single witness is sufficient to support a finding unless the testimony is physically impossible or its falsity is apparent 'without resorting to inferences or deductions.' [Citations.] Except in these rare instances of demonstrable falsity, doubts about the credibility of the in-court witness should be left for the [fact finder]'s resolution." (*People v. Cudjo* (1993) 6 Cal.4th 585, 608–609 (*Cudjo*).)

6

Substantial evidence supports Chioma's convictions. Doe testified with certainty at trial that Chioma was the man who first removed her from her car and forced her to orally copulate him. Doe explained, "the street behind was lit up pretty good. That is why the face coming in made me be able to identify Mr. Chioma very clearly, because getting out of the car that's the first person I saw with the light [shining] on[] him and I won't forget that face." Though Chioma is correct that Doe confused the two appellants at times during her trial testimony, she immediately corrected herself in specifically identifying Chioma as the man who hit Reynolds with the gun. Her testimony on this point was supported by the DNA evidence that it was Edwards who raped her from behind while Chioma left to silence Reynolds. Doe also testified that the video evidence allowed her to distinguish between Chioma and Edwards as to the specific acts for which each man was responsible. On its own, Doe's testimony provides substantial evidence of Chioma's involvement in these crimes. (*Cudjo*, *supra*, 6 Cal.4th at pp. 608–609.)

While this ends the matter, we note further that the 13-minute phone call to Chioma's phone is not conclusive evidence of Chioma's alibi. The evidence established only the time the call occurred, its duration, and that it was made from a mobile phone associated with one of Chioma's contacts to one of two mobile phones associated with Chioma. There was no evidence about who, if anyone, spoke to Bankhead during the call or what was said. There also was no evidence of the phone's location or who possessed it at the time of the call. The jury heard all the evidence, and Chioma had the opportunity to cross-examine. The jury's verdicts indicate that it credited the prosecution's evidence over Chioma's, and because substantial evidence in the form of Doe's testimony supports the jury's verdicts we may not revisit them on appeal. (*Cudjo*, *supra*, 6 Cal.4th at pp. 608–609.)

### B. The Gun Photographs Were Properly Admitted

Edwards argues the trial court abused its discretion by admitting photographs of guns that were taken by, and recovered from, one of Chioma's mobile phones.

In moving to admit the photographs, the prosecution noted that one photograph depicted two guns that "appeared to be the exact two guns that were seized on

7

[December] 13th" and that the photograph had been taken shortly before that incident. The prosecution explained that the photographs were taken both before and after the December 8th incident, specifically on: September 28, 2012; November 19, 2012; November 24, 2012; December 6, 2012; and December 12, 2012. The prosecution offered the photographs as relevant to show that the guns used in the December 8th incident, which were not seized, were real firearms (not toys or replicas) as required to support the firearm enhancements associated with those counts, in that Chioma and Edwards had access to real guns beyond the two they were caught with at the time of their arrests. Chioma's counsel objected to the photographs as unnecessary to prove the December 13th charges and as impermissible propensity evidence for the December 8th counts.

The court admitted the photographs over Chioma's objection, "in light of the fact that no guns were recovered from the first incident, and one of the things [the prosecution is] endeavoring to prove is the use of a real firearm, and the witness's testimony that it was silver and the guns recovered a few days later being black, I think the access to other weapons does become relevant." The court concluded that any prejudice did not substantially outweigh the photographs' probative value, as required under Evidence Code section 352. And the court did grant Chioma's request to instruct the jury "that evidence that either defendant possessed a firearm may not be used to infer that the defendant has a propensity to commit crime."

Edwards's counsel was silent during the proceedings on this issue and did not join in Chioma's objection to the photographs. But Chioma's objection, to the same evidence and on the same grounds, was sufficient to preserve the issue for our appellate review. (*People v. Gamache* (2010) 48 Cal.4th 347, 373.) In addition, we exercise our discretion to excuse Edwards's lack of objection so that we may dispose of this issue on its merits. (*People v. Abbaszadeh* (2003) 106 Cal.App.4th 642, 649, citing *People v. Williams* (1998) 17 Cal.4th 148, 161–162, fn. 6.)

Edwards now argues the photographs should not have been admitted because they were unnecessary to show the guns used on December 8th were real, and the photographs

prejudicially suggested Edwards was a person "of bad character with a propensity to commit" crimes. In denying that the photographs were relevant to show the guns used on December 8th were real, Edwards cites evidence that "both Doe and Reynolds described metal guns (not plastic guns) and described them in considerable detail." We disagree that the witnesses' testimony precluded the prosecution from also introducing the photographs as circumstantial evidence that the guns were real.

We review the trial court's decision to admit photographs under Evidence Code section 352 for abuse of discretion. (*People v. Peoples* (2016) 62 Cal.4th 718, 748.) " ' " 'The court's exercise of that discretion will not be disturbed on appeal unless the probative value of the photographs clearly is outweighed by their prejudicial effect.' " ' " (*Ibid.*, quoting *People v. McKinzie* (2012) 54 Cal.4th 1302, 1351.)

Evidence that the defendant possessed a weapon may be admitted if the weapon used in the crime is unknown, or if the proposed evidence is relevant to some issue other than the defendant's propensity to possess weapons. (*People v. Cox* (2003) 30 Cal.4th 916, 956, disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) Such evidence may be relevant and admissible as circumstantial evidence that a defendant committed the charged offenses. (*People v. Carpenter* (1999) 21 Cal.4th 1016, 1052.) The weapons used in the December 8th incident were to some extent unknown. Though Doe and Reynolds testified that both Chioma and Edwards used guns and the witnesses gave a physical description of the guns they saw, no specific guns were recovered at the scene.

The photographs in question were evidence that Chioma and Edwards had access to guns on other occasions. One photograph depicted the gun found at Edwards's feet on December 13th, and there was no dispute that that gun was real. Chioma testified that another photograph showed Edwards with a gun on his hip on a different occasion. In addition, the photographs may have depicted the gun Chioma used on December 8th. The photographs admitted at trial were not transmitted to us along with the rest of the appellate record, so we rely on the sparse descriptions in the Reporter's Transcript. Nevertheless, we agree with the attorney general that the photographs were evidence

9

Edwards and Chioma possessed real guns on other occasions, and they were relevant to show that appellants used real guns during the December 8th incident.

In addition, the photographs had probative value to show that Edwards and Chioma worked in concert during the December 8th assault. The photograph of Edwards with a gun on his hip was taken on or before December 6, 2012, just two days before the sexual assault. That photograph also depicted Chioma and Edwards together, alongside other men, connecting the two men before the date of the assault. At least one other photograph from Chioma's phone depicted the two men together. The oral copulation and rape counts alleged Edwards and Chioma acted in concert, and the photographs— including the photograph of Edwards with a gun on his hip—were probative of that element of those offenses.

Any undue prejudice from these photographs was mitigated by other evidence showing appellants used real firearms during the December 8th incident, including the victims' testimony as summarized by Edwards in his own opening brief: "Doe stated she felt a metal gun on the side of her head. [. . .] She had grown up with guns and knew what they looked like; the barrel of this one was cold and metal. [. . .] That was Chioma's gun. [. . .] She said Edwards also had a gun, pointing at her chest. [. . .] When Chioma hit Reynolds in the back of the head, the sound was as if he hit him with a gun. [. . .] Similarly, when Reynolds was accosted he felt something hard, like the barrel of a gun, pressed into the back of his head. [. . .] That gun was a black semiautomatic. [. . .] The other person's gun was a shiny revolver, perhaps nickel. [. . .] These were not toys." The record supports this assessment of the gun evidence. Although this testimony reduced the prosecutor's need to rely on the photographs as evidence that Chioma and Edwards were using real guns in the assault, it simultaneously reduced any prejudice to appellants from admitting the photographs into evidence. The witness testimony tended to establish that Chioma and Edwards had access to guns, and the photographs corroborated this. Having reasonably weighed the probative value of the photographs against their undue prejudice to appellants, the trial court did not abuse its discretion by admitting them.

10

Any remaining prejudice to appellants was cured by the court's limiting instruction—that evidence either defendant possessing a firearm may not be used to infer that the defendant has a propensity to commit crime—an instruction we presume the jury understood and followed. (*People v. Edwards* (2013) 57 Cal.4th 658, 746.) Thus, there was little risk the jury would have used the challenged photographs improperly.

For these same reasons, any error in admitting them was also harmless under the standard announced in *People v. Watson* (1956) 46 Cal.2d 818, 836—whether it is reasonably probable that, absent the error, the jury would have returned a verdict more favorable to Edwards—which is the standard that applies here. (See *People v. Paniagua* (2012) 209 Cal.App.4th 499, 524.)

## II.    Appellants' Sentencing Claims

### A. *Appellants' Sentences Are Not Cruel and Unusual Punishment*

"Whether a punishment is cruel and/or unusual is a question of law," so we exercise independent review while considering in the light most favorable to the judgment any underlying disputed facts. (*People v. Palafox* (2014) 231 Cal.App.4th 68, 82.)

In the opening brief appellants argue that their respective prison sentences violate federal and state prohibitions on cruel and unusual punishment by failing to account for their "extreme youth" at the time of the offenses. Both 19 years old when they committed these crimes, appellants rely on cases holding that the law requires children to be treated differently from adults for sentencing purposes, including *Graham v. Florida* (2010) 130 S.Ct. 2011 (*Graham*), *Roper v. Simmons* (2005) 543 U.S. 551, *Miller v. Alabama* (2012) 132 S.Ct. 2455 (*Miller*), and *People v. Caballero* (2012) 55 Cal.4th 262 (*Caballero*). Acknowledging they were over 18, appellants contend "none of the relevant mitigating characteristics of youth discussed in those cases end abruptly on one's 18th birthday." Appellants do not revisit this argument in their reply briefs, however, and we reject it for the reasons stated in *People v. Argeta* (2012) 210 Cal.App.4th 1478, 1482, namely that a defendant's 18th birthday marks a bright line, and only for crimes committed before that date can he or she take advantage of the *Graham/Caballero*

11

jurisprudence in arguing cruel and unusual punishment. (*Ibid*.) We turn, then, to appellants' proportionality arguments.

The Eighth Amendment contains a " 'narrow proportionality principle' that 'applies to noncapital sentences.' " (*Ewing v. California* (2003) 538 U.S. 11, 20.) The Eighth Amendment "forbids only extreme sentences that are 'grossly disproportionate' to the crime." (*Harmelin v. Michigan* (1991) 501 U.S. 957, 1001 (*Harmelin*) (conc. opn. of Kennedy, J.).) Reviewing courts must " 'grant substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments for crimes.' " (*Id*., at p. 999, quoting *Solem v. Helm* (1983) 463 U.S. 277, 290.) This is especially so in assessing the proportionality of a sentence of imprisonment, where "the relative lack of objective standards concerning terms of imprisonment" means that successful challenges are " ' "exceedingly rare." ' " (*Harmelin,* at p. 1001, quoting *Solem v. Helm*, *supra*, at pp. 289–290.) Even "extended analysis" of a sentence's proportionality is rarely required. (*Harmelin,* at p. 1004.) "[C]omparative analysis within and between jurisdictions is . . . [¶] . . . appropriate only in the rare case in which a threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality." (*Id*. at pp. 1004–1005.)

" 'Article I, section 17, of the California Constitution separately and independently lays down the same prohibition' " as the Eighth Amendment. (*People v. Marshall* (1990) 50 Cal.3d 907, 938, quoting *People v. Poggi* (1988) 45 Cal.3d 306, 349 (conc. & dis. opn. of Mosk, J.).) A punishment may violate article I, section 17 of the California Constitution if "it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." (*In re Lynch* (1972) 8 Cal.3d 410, 424, fn. omitted.) It requires that we "examine the circumstances of the offense" and the defendant in determining whether the "the penalty imposed is 'grossly disproportionate to the defendant's culpability.' " (*Cox*, *supra*, 30 Cal.4th at pp. 969–970, quoting *People v. Dillon* (1983) 34 Cal.3d 441, 479.) We assess three factors in making this determination: (1) the nature of the offense and the offender, and the degree of danger posed to society; (2) a comparison with sentences for more serious offenses

12

under California law; and (3) a comparison with sentences imposed by other states for the same offense. (*Lynch,* at pp. 425–427.)

Appellants argue that their respective sentences shock the conscience considering the circumstances of the crimes, the "attenuated" level of violence involved, and their minimal criminal histories. Appellants challenge only the total length of their prison sentences—129 years for Chioma and 95 years for Edwards—rather than any specific sentencing decision by the trial court.

Given the limited role for a reviewing court in a case where the challenge is to the length of a prison term, we reject this argument. Appellants' crimes here were egregious. What may have begun as an armed robbery quickly turned into a violent sexual assault. After demanding her valuables, Chioma held a gun to Jane Doe's head to force her to orally copulate him and to facilitate two instances of rape by Edwards. In response to perceived resistance, Chioma hit Reynolds in the head with a gun, leaving him with damaged eyesight. Also using a gun, Edwards raped Doe on two separate occasions during the incident. We acknowledge that each appellant had little prior criminal history and no prior history of committing sex offenses, but these facts do not outweigh the ruthlessness of this attack.

A key factor in the length of each appellant's sentence was the trial court's determination that the sentences on the sex counts be served consecutively pursuant to rule 4.426 of the California Rules of Court. Appellants do not challenge the trial court's findings under rule 4.426, or its conclusion that their relevant sentences must be served consecutively. The sentencing record reflects that the trial court followed the statutory guidelines and rules of court assiduously, detailing each appellant's path to his total prison term.

Under these circumstances, we find no principled basis for concluding that these sentences, though each amounts to a term of life in prison, fall outside the range where a reviewing court must defer to legislative judgments on criminal sentencing. (See *Harmelin*, *supra*, 501 U.S. at p. 999 (conc. opn. of Kennedy, J.).) We cannot conclude

13

that either sentence violates federal or state constitutional proscriptions on cruel and/or unusual punishment.

### B. *Equal Protection Requires Youthful-Offender Parole Hearings for One-Strikers*

Appellants contend that section 3051, subdivision (h) violates the Equal Protection Clause of the Fourteenth Amendment by excluding certain young adult offenders, such as themselves, from its protections. Under section 3051, a person convicted of an offense committed when he or she was 25 years of age or younger becomes eligible for release on parole at a youth-offender parole hearing held during his or her 15th, 20th, or 25th year of incarceration, depending on the offense. (§ 3051, subd. (b).) However, section 3051, subdivision (h) excludes offenders like appellants who were sentenced under section 667.61, the "One Strike" law. Appellants' equal protection challenge to this exclusion is a facial challenge, as it was not raised in the court below. (See *In re Sheena K.* (2007) 40 Cal.4th 875, 885.)

### 1. Chioma and Edwards are "One-Strikers"

The "One Strike" law is an alternative, harsher sentencing scheme that applies to specified felony sex offenses. (*People v. Anderson* (2009) 47 Cal.4th 92, 102.) Appellants were each convicted of forcible rape in concert and forcible oral copulation in concert, which are among the offenses that qualify for treatment under the One Strike law. (§ 667.61, subds. (c)(3), (c)(7).)

"For sex crimes falling within its reach [citation], a first-time offense can result in one of two heightened sentences. The sentence will be 15 years to life if the jury finds (or the defendant admits) one or more of the 'circumstances' listed in section 667.61, subdivision (e)." (*People v. Perez* (2015) 240 Cal.App.4th 1218, 1223 (*Perez*).) "The sentence will be 25 years to life if the jury finds (or the defendant admits) either (1) *two* of the 'circumstances' listed in section 667.61, subdivision (e), or (2) *one* of the more aggravated circumstances listed in section 667.61, subdivision (d)." (*Perez*, *supra*, 240 Cal.App.4th at p. 1223.)

14

Several circumstances enumerated in subdivisions (d) and (e) are relevant to this case. Subdivision (d) includes crimes where "[t]he defendant personally inflicted great bodily injury on the victim or another person in the commission of the present offense. . . ." (§ 667.61, subd. (d)(6).) This circumstance applies to Chioma, who inflicted such injury on Reynolds. Subdivision (e) includes crimes where a "defendant personally used a dangerous or deadly weapon or a firearm . . . ," a circumstance that applies to both defendants here. (§ 667.61, subd. (e)(3).) Subdivision (e) also reaches crimes, in the commission of which, "any person" inflicts great bodily injury on the victim of the sex crime or another person. (§ 667.61, subd. (e)(7).) This enhancement applies to Edwards, as a result of another person—Chioma—having injured Reynolds.

In sum, Chioma qualifies as a "One-Striker" because the jury found true the allegations under section 667.61, subdivision (d)(6) that he personally inflicted great bodily injury on Reynolds. Then, because the jury also found true the firearm enhancements, but Chioma was already a One-Striker without them, Chioma's sentence for each of counts 1, 3, and 4 rose to 35 years to life. (§ 667.61, subd. (f); § 12022.53, subd. (b).) Meanwhile, Edwards qualified as a "One-Striker" because the jury found true as to each count two subdivision (e) allegations: that Edwards used a firearm, and that Chioma inflicted great bodily injury on Reynolds. (§ 667.61, subd. (e)(3) & (7).) The jury's findings on these allegations subjected Edwards to 25 years to life on each of counts 1, 3, and 4.

### 2. Section 3051 Establishes Youthful-Offender Parole Hearings

In *Caballero*, the California Supreme Court urged the state legislature to establish a parole eligibility mechanism for a defendant "serving a de facto life sentence without possibility of parole for nonhomicide crimes that he or she committed as a juvenile." (*Caballero, supra*, 55 Cal.4th at p. 269, fn. 5.) The Legislature complied and then went a step further, creating a parole eligibility mechanism for juvenile offenders that includes homicide defendants, which it subsequently expanded to reach most defendants serving long sentences for crimes they committed at 25 years of age or younger. (*People v.*

*Contreras* (2018) 4 Cal.5th 349, 381 (*Contreras*).)  This parole eligibility mechanism is section 3051.

Section 3051 affects three categories of lengthy sentences.  A defendant who commits his or her "controlling offense" at age 25 or younger and who receives a long *determinate sentence* becomes eligible for release on parole "during his or her 15th year of incarceration."  (§ 3051, subd. (b)(1).)  When the sentence for the controlling offense is a *life term of less than 25 years to life*, the offender becomes eligible for parole during the 20th year of incarceration.  (§ 3051, subd. (b)(2).)  And when the sentence for the controlling offense is *25 years to life*, the offender becomes eligible for parole during the 25th year of incarceration.  (§ 3051, subd. (b)(3).)  " 'Controlling offense' means the offense or enhancement for which any sentencing court imposed the longest term of imprisonment."  (§ 3051, subd. (a)(2)(B).)  Chioma's and Edwards's sentences would fit into the third category, for controlling offenses punished by sentences of 25 years to life.

Section 3051 has a carve-out, however, and it is the scope of that carve-out that gives rise to appellants' equal protection claim.  Subdivision (h) of section 3051 expressly excludes from eligibility for a youthful-offender parole hearing any inmate sentenced under the Three Strikes law, under the One Strike law, or to Life Without Possibility of Parole (LWOP) for an offense committed after the defendant turned 18.[2]  Because Chioma and Edwards were sentenced as "One-Strikers," section 3051, subdivision (h) renders them ineligible for a youthful-offender parole hearing, even though they committed their crimes at age 19.

---

[2] Section 3051, subdivision (h), reads:  "This section shall not apply to cases in which sentencing occurs pursuant to Section 1170.12, subdivisions (b) to (i), inclusive, of Section 667 [Three Strikes], or Section 667.61 [One Strike], or to cases in which an individual is sentenced to life in prison without the possibility of parole for a controlling offense that was committed after the person had attained 18 years of age.  This section shall not apply to an individual to whom this section would otherwise apply, but who, subsequent to attaining 26 years of age, commits an additional crime for which malice aforethought is a necessary element of the crime or for which the individual is sentenced to life in prison."

### 3. Equal Protection Renders One-Strikers Eligible for Youthful-Offender Parole Hearings

Appellants argue that section 3051, subdivision (h), violates their right to equal protection because, although the statute reaches almost all youthful offenders who draw life terms or long determinate sentences, it excludes them. Specifically, section 3051 reaches first degree murderers but excludes One Strikers. Appellants contend they are similarly situated to youthful first degree murderers, and they challenge their exclusion from this statutory scheme as unsupported by any rational basis, arguing it is driven only by "the fact that the public has a special distaste for sex offenders." We conclude that while a sentencing scheme can rationally express the public's distaste for sex offenders, it cannot limit their opportunity for eventual parole more harshly than it limits these who commit intentional first degree murder. Equal protection requires that Chioma and Edwards, like those whose controlling offense is first degree murder punishable by 25 years to life, be afforded a youthful offender parole hearing during the 25th year of their incarceration.

The Fourteenth Amendment to the United States Constitution and article I, section 7 of the California Constitution guarantee all persons the equal protection of the laws. To succeed on an equal protection claim, appellants must first show that the state has adopted a classification that affects two or more similarly situated groups in an unequal manner. (*People v. Wilkinson* (2004) 33 Cal.4th 821, 836.) For example, One Strike rapists and first degree murderers, both aged 25 years or younger, are two groups of violent youthful offenders who seek the opportunity to demonstrate after extended terms of imprisonment that they should rejoin society. The two groups are, for purposes of section 3051, "similarly situated." (*People v. Brandao* (2012) 203 Cal.App.4th 436, 442.)

Where a class of criminal defendants is similarly situated to another class of defendants who are sentenced differently, courts look to determine whether there is a rational basis for the difference. (*Johnson v. Department of Justice* (2015) 60 Cal.4th 871, 882.) "[E]qual protection of the law is denied only where there is no

17

'rational relationship between the disparity of treatment and some legitimate governmental purpose.' " (*People v. Turnage* (2012) 55 Cal.4th 62, 74 (*Turnage*).) "This standard of rationality does not depend upon whether lawmakers ever actually articulated the purpose they sought to achieve. Nor must the underlying rationale be empirically substantiated. [Citation.] While the realities of the subject matter cannot be completely ignored [citation], a court may engage in ' "rational speculation" ' as to the justifications for the legislative choice [citation]. It is immaterial for rational basis review 'whether or not' any such speculation has 'a foundation in the record.' " (*Id.* at pp. 74–75.) To mount a successful rational basis challenge, a party must " 'negative every conceivable basis' " that might support the disputed statutory disparity. (*Heller v. Doe* (1993) 509 U.S. 312, 320; see *Turnage,* at p. 75.) If a plausible basis exists for the disparity, "[e]qual protection analysis does not entitle the judiciary to second-guess the wisdom, fairness, or logic of the law." (*Turnage,* at p. 74.)

Because rational basis review is a highly deferential standard, one published opinion that has considered the equal protection argument appellants make here has already rejected the challenge (*People v. Bell* (2016) 3 Cal.App.5th 865, 876–880 (*Bell*), review granted on another ground on Jan. 11, 2017), but that decision has since been ordered vacated (*People v. Bell* (June 13, 2018, S238339) __ Cal.5th __ [234 Cal.Rptr.3d 74] [transferring for reconsideration in light of *Contreras*, *supra*, 4 Cal.5th 349].) The *Bell* court concluded that concerns about recidivism provide a rational basis for excluding One Strike defendants from the benefits of section 3051. (*Bell*, at p. 879.) The California Supreme Court granted review in *Bell* and deferred further action pending its decision in *Contreras*.

In deciding *Contreras*, the Supreme Court held that the Eighth Amendment prevents juvenile non-homicide offenders from receiving sentences so long that the offenders will have no prospect of release while still young enough to reintegrate with society. *Contreras* involved two 16-year-olds convicted of kidnapping and sexual offenses, sentenced to 50 years to life and 58 years to life, respectively. These sentences meant the young men could expect to become eligible for parole late in life. (*Contreras*,

*supra*, 4 Cal.5th at pp. 356, 368.) *Caballero* had previously held that for a juvenile to receive a sentence twice that long—110 years to life—violates the Eighth Amendment because this sentence is the "functional equivalent of LWOP." (*Contreras*, at p. 360.) *Contreras* extends *Caballero* by applying the same reasoning and reaching the same result for juvenile non-homicide offenders whose sentences, while lengthy, are not "well in excess of natural life expectancy." (*Ibid.*)

In *Contreras* the high court acknowledged, but had no occasion to resolve, the equal protection challenge to section 3051. (*Contreras*, *supra*, 4 Cal.5th at p. 382.) Dicta in *Contreras* highlights, however, a consistent theme in constitutional jurisprudence that we think does resolve the equal protection challenge. *Contreras* quotes *Graham, supra,* 130 S.Ct. 2011, for this proposition: " '[D]efendants who do not kill, intend to kill, or foresee that life will be taken are categorically less deserving of the most serious forms of punishment than are murderers. . . . Although an offense like robbery or rape is "a serious crime deserving serious punishment," those crimes differ from homicide crimes in a moral sense.' " (*Contreras*, at p. 366.) *Contreras* goes on to observe, "[i]n the death penalty context, the high court has said 'there is a distinction between intentional first-degree murder on the one hand and nonhomicide crimes against individual persons, even including child rape, on the other. The latter crimes may be devastating in their harm, as here, but "in terms of moral depravity and of the injury to the person and to the public," they cannot be compared to murder in their "severity and irrevocability." ' (*Kennedy v. Louisiana* (2008) 554 U.S. 407, 438, citation omitted.)" (*Contreras*, at p. 382.) *Contreras*, in short, confirms that there is no crime as horrible as intentional first degree murder.

United States Supreme Court case law has long distinguished between such murders and other crimes against persons, reserving the most draconian sentences for murderers alone. Consistent with the Eighth Amendment, first degree murderers can be executed; defendants convicted of even the most egregious sexual crimes cannot. (*Kennedy v. Louisiana, supra,* 554 U.S. 407 [aggravated rape of a child]; *Coker v. Georgia* (1977) 433 U.S. 584 [armed robbery, rape of an adult woman, and other

19

felonies].)  Juveniles who murder can be sentenced to life without the possibility of parole, if in fixing that sentence the sentencer has considered mitigating circumstances including "how children are different, and how those differences counsel against" an LWOP sentence.  (*Miller, supra,* 567 U.S. at pp. 479–480, 489.)  Juveniles who commit non-homicide crimes, by contrast, are categorically exempt from LWOP sentences.  (*Graham*, *supra*, 560 U.S. at p. 82.)  Section 3051 flouts this pattern.  It makes youthful-offender parole hearings available to intentional first degree murderers after 25 years of incarceration, while categorically denying them to One Strike sex offenders.

Considering this U.S. Supreme Court jurisprudence and the California Supreme Court's invocation of it in *Contreras*, we conclude section 3051's carve-out for One Strike defendants violates principles of equal protection.  It is, to that extent, unconstitutional.  We see no rational relationship between the disparity of treatment and a legitimate governmental purpose.  Certainly, the crimes punished by the One Strike law are heinous, and the crimes in this case are among the most awful in our judicial system short of murder.  But United States Supreme Court and California Supreme Court precedent has already determined that these defendants " 'are categorically less deserving of the most serious forms of punishment than are murderers.' " (*Contreras*, *supra*, 4 Cal.5th at p. 366, quoting *Graham*, *supra*, 560 U.S. at p. 69.)  Because the Legislature made youthful offender parole hearings available even for first degree murderers (except those who committed murder as an adult *and* received an LWOP sentence), there is no rational basis for excluding One Strike defendants from such hearings.  This does not mean, of course, that Chioma, Edwards, or any other One Strike defendant will be released from prison after 25 years in custody, only that they will become eligible for a youthful offender parole hearing at that time.

Respondent makes two arguments against the equal protection challenge.  First the attorney general asserts that Chioma and Edwards are not "similarly situated" with first degree murderers because their crimes are not the same.  But equal protection analysis does not require that two groups of defendants be the same, or even that they be " ' "similarly situated for all purposes." ' " (*Brandao*, *supra*, 203 Cal.App.4th at p. 442.)

20

It is enough that " ' " 'they are similarly situated for purposes of the law challenged.' " ' "
(*Ibid.*)  Here, the purpose of section 3051 is to give youthful offenders "a meaningful opportunity to obtain release" after they have served at least 15, 20, or 25 years in prison (§ 3051, subd. (e)) and made "a showing of rehabilitation and maturity."  (*Contreras*, *supra*, 4 Cal.5th at 381.)  The Legislature said so expressly when it first passed the bill that became section 3051:  "The purpose of this act is to establish a parole eligibility mechanism that provides a person serving a sentence for crimes that he or she committed as a juvenile the opportunity to obtain release when he or she has shown that he or she has been rehabilitated and gained maturity, in accordance with the decision of the California Supreme Court in *Caballero, supra,* 55 Cal.4th 262 and the decisions of the Unites States Supreme Court in *Graham[, supra,]* 560 U.S. 48, and *Miller[, supra,]* 183 L.Ed.2d 407."  (Sen. Bill No. 260 (2013–2014 Reg. Sess.) § 1.)  Then, when the Legislature expanded section 3051's parole eligibility mechanism to reach young adults up to the age of 25, its expressly-stated rationale was to account for neuro-science research that the human brain—especially those portions responsible for judgment and decision-making—continues to develop into a person's mid-20s.  (Sen. Com. on Public Safety, Analyses of Sen. Bill. No. 261 (2015–2016 Reg. Sess.) April 28, 2015 [expanding eligibility to age 23]; Sen. Rules Comm., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 1308 (2017–2018 Reg. Sess.) as amended March 30, 2017 [expanding eligibility to age 25].)  Measured against this legislative purpose, youthful One Strike defendants are similarly situated with youthful first degree murderers, and the attorney general does not attempt to argue otherwise.

The attorney general's second argument is that the Legislature "clearly made a rational, moral judgment that the public should be protected from violent sex offenders, and that violent sex offenders should be incarcerated for longer periods of time."  This argument is both vague and circular.  Does the attorney general intend "incarcerated for longer" to be a comparison between One Strikers and murderers?  If so, the argument chases its tail:  the rationale for punishing One Strike offenders more harshly than murderers is simply that they should be incarcerated for longer than murderers.  In fact,

21

the attorney general sidesteps any actual comparison between One Strikers and murderers. Attempting to explain *why* the Legislature could believe that violent sex offenders should be punished harshly, or more harshly, the attorney general offers only that "violent rapists do recidivate, and the state has a legitimate interest in severely punishing this crime." But of course murderers, too, recidivate, and the state has an interest in severely punishing the crime of murder. The essence of an equal protection challenge is a comparison between similarly situated groups, and the attorney general carefully avoids making any such comparison. Certainly, the attorney general cites no evidence that violent rapists recidivate more than other felons. Indeed, when a recidivism rationale prevailed in *Bell* the only evidence discussed in the opinion was to the contrary. (*Bell*, *supra*, 3 Cal.App.5th at pp. 879–880 [discussing Department of Corrections report].) While the law requires no empirical support for the hypothesized concern about recidivism (*Turnage*, *supra,* 55 Cal.4th at pp. 74–75), "the realities of the subject matter cannot be completely ignored." (*Johnson*, *supra*, 60 Cal.4th at p. 881.)

More importantly, we cannot ignore United States Supreme Court teaching that no crime deserves categorically harsher punishment than intentional first degree murder. We recognize that an individual non-homicide defendant may on occasion draw a harsher sentence than does a first-degree murder, for reasons specific to the circumstances of the crime or the criminal history of the defendant. We express no view about this sort of comparison between sentences in individual cases, and we note that criminal history plays no role in defining a One Strike crime. The problem in this case is that an entire class of youthful offenders convicted of a crime short of homicide is, regardless of criminal history, categorically exempted from an opportunity offered to *all* youthful first degree murderers except those sentenced to life without possibility of parole.

The Legislature did not explain, in enacting or expanding section 3051, why it chose to exempt One Strike offenders.[3] As neither the Legislature nor the attorney

---

[3] Also without explanation, the Legislature made a different decision in crafting the analogous Elderly Parole Program, which excludes from eligibility certain categories of recidivist defendants and first-degree murderers (those receiving LWOP or death

22

general has provided a rational basis for categorically excluding youthful One Strikers, we conclude that this carve-out in section 3051, subdivision (h) violates principles of equal protection and is unconstitutional on its face. Because the law makes youthful-offender parole hearings available even to first degree murderers, it must, after 25 years of incarceration, offer the same to Chioma and Edwards.

## DISPOSITION

The matter is remanded to the trial court for the purpose of determining whether Chioma and Edwards were "afforded an adequate opportunity to make a record of information that will be relevant to the Board" at a youthful offender parole hearing to be held during their 25th year of incarceration. (*People v. Franklin* (2016) 63 Cal.4th 261, 286–287.) In all other respects, the judgment is affirmed.

---

sentences, or who killed police officers) but does not exclude One Strikers. (§ 3055, subds. (g) and (h).)

_____
TUCHER, J.


WE CONCUR:


_____
POLLAK, P. J.


_____
STREETER, J.


A147379, A147103/ *People v. Chioma, People v. Edwards*

24

Trial Court:                                                                     Alameda County Superior Court

Trial Judge:                                                   Hon. Thomas M. Reardon

Counsel for Appellants:                        Emmanuel Chioma – Ozro William Childs, by Court-Appointment under the First District Appellate Project - Independent Case System

Antonio Edwards – David Y. Stanley, by Court-Appointment under the First District Appellate Project - Independent Case System

Counsel for Respondents:                      Xavier Becerra, Attorney General; Gerald A. Engler, Chief Assistant Attorney General; Jeffrey M. Laurence, Senior Assistant Attorney General; Bruce M. Slavin, Supervising Deputy Attorney General; Gregg E. Zywicke, Deputy Attorney General